IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LARRY HATTEN, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CA. NO. C-02-20 |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER DENYING HATTEN'S
## PETITION FOR A WRIT OF HABEAS CORPUS

Larry Hatten is a Texas inmate currently incarcerated under a capital conviction and death

sentence. On April 18, 2003, he filed a federal petition for a writ of habeas corpus (D.E. 22). From

a straight path of available evidence, capable of prompt resolution at trial, the procedural rulings at

trial and on appeal have effectively tied a gordian knot. After review, the Court holds that Hatten

is not entitled to federal habeas relief and orders a judgment denying his petition.

### FACTUAL AND PROCEDURAL BACKGROUND

The record and jury verdict establish that Hatten shot to death five-year-old Isaac Jackson

as he lay asleep with his mother. This tragic waste began over the most stupid of disputes. In

September 1995, a feud developed between Fabian Douglas and Gerald Henry, a local Corpus

Christi drug dealer. Fabian Douglas is Hatten's stepbrother. Henry and Douglas both owned

BMW's. Douglas believed Henry had been criticizing his BMW amidst their social circles. One

night Hatten and Douglas assaulted Henry in the street. Henry claimed that Hatten and Douglas took

some jewelry from him during the scuffle. Henry reported the theft to the police, who arrested

Douglas for aggravated robbery and filed charges against Hatten. To avenge himself for the assault,

Henry hired a third party to set fire to Douglas' cars.

On or about September 15, 1995, after learning of Douglas' arrest, Hatten went to Robinson's house. When he arrived he saw Henry enter Robinson's home. Hatten went home, got a pistol, and returned to Robinson's house. Robinson would not let him in. Hatten was enraged and said, "If you are with [Henry], then you are going to end up getting the same thing [Henry] gets." Tr. Vol. 20 at 473. Henry called 9-1-1, and Hatten fled. As if it should matter, Robinson knew about Henry's plan to torch the cars.

On September 18, 1995, Douglas and Hatten spent the evening drinking alcohol and using marijuana. Around two o'clock the next morning, Douglas heard a gunshot outside his house. He went outside to find two of his cars on fire. Douglas assumed Henry was responsible for the fire and called Hatten, "They burned up my cars." Tr. Vol. 20 at 432; Tr. Vol. 18 at 200. After seeing the burning cars, Hatten retrieved a gun from his house and ran to Robinson's house. Hatten entered the back door, kicked in the bedroom door and emptied his gun into the bed. Tabatha Jackson Thompson and her five-year-old son, Isaac Jackson, were asleep in the bed. Hatten knew that she and her son had recently moved in with Robinson. Tr. Vol. 18 at 50.

Thompson heard a noise at the back door and assumed that Robinson was home. The bedroom door suddenly burst open, and Hatten began shooting. Thompson begged, "Stop. It's just me and my baby." Tr. Vol. 18 at 57. Hatten unloaded his pistol into the bed. Not only did Issac die, but his mother was also severely wounded by four shots.

Thompson testified at trial that "I thought he was going to kill me, so I ran back to the bed and I picked my baby up and I started rocking him. I started praying and he wouldn't never wake up." Tr. Vol. 18 at 58. Hatten left the house. Despite her serious wounds, Thompson called

2

9-1-1. She held her dead son until the police arrived. Thompson identified Hatten as the shooter.

The police found Hatten driving around and covered in blood. He was hostile and uncontrollable when they arrested him. Hatten yelled that his "bro had called him . . . [and] told him that they blew up my cars and that [he] had to come over to help his bro." Tr. Vol. 18 at 169. Hatten asked why he was being arrested. The police told him it was because of what happened at Robinson's house, and Hatten asked "Who died over there?" Tr. Vol. 18 at 172.

The State of Texas indicted Hatten for the capital murder of Isaac Jackson and the aggravated assault of Tabatha Jackson Thompson. Trial began on January 29, 1996. Neither Hatten's behavior nor his identity were issues at trial. The prosecution's death case rested on Texas' transferred intent doctrine. Hatten's defense was that he did not know what he was doing when he shot into the bed, and that even if he intended to shoot Robinson, his intent to kill Robinson could not transfer to Isaac. On February 8, 1996, the jury found Hatten guilty of capital murder. After a separate punishment phase, the jury found that Hatten would be a future societal danger and that no mitigating circumstances required a sentence less than death, and so by clear application of Texas law, Hatten was sentenced to die.

On March 10, 1997, Hatten filed his direct appeal. On December 31, 1997, Hatten filed his initial state habeas application. The Court will refer to Hatten's initial habeas application as "the 1997 writ." Procedural problems developed on April 29, 1998, when the Court of Criminal Appeals ruled favorably on Hatten's issues related to his punishment sentence. The Court ordered a new punishment hearing on Hatten's direct appeal but did not address the 1997 writ, which alleged constitutional issues in the guilt/innocence phase of his trial, not just punishment issues.

3

The state district court followed with a new punishment trial, and on December 9, 1998, the second jury also entered a death penalty verdict. Hatten then filed a second direct appeal on October 26, 1999, and a second state habeas application on August 7, 2000. The Court will refer to Hatten's second state habeas application as "the 2000 writ." As would reasonably be expected, his second appeal and habeas application only raised issues arising from the second death sentence. Hatten's claims challenging guilt/innocence were not raised or argued in his second appeal or the 2000 writ, but the 1997 writ was included in the record on his second appeal. On August 28, 2000, the state district court entered a recommendation on the 2000 writ and forwarded the case to the Court of Criminal Appeals. On June 20, 2001, the Court of Criminal Appeals denied Hatten's second appeal. On January 9, 2002, the Court of Criminal Appeals denied relief on the 2000 writ. To this day, the Court of Criminal Appeals has never considered Hatten's 1997 writ claims regarding the guilt/innocense phase of his trial. On April 18, 2003, Hatten filed a federal habeas petition in this Court.

The sequence of events mentioned above and their respective dates are summarized in Appendix A, which is attached.

## STATEMENT OF CLAIMS

Hatten raises eleven claims in his federal habeas petition. The federal habeas petition presents a mixed bag of claims. Some of these claims were alleged in his 1997 writ, and others were not.

      1.      The combined effect of Texas' capital murder statute and transferred intent doctrine violated Hatten's constitutional rights.

      2.      Defense counsel provided ineffective assistance in (a) the guilt/ innocence and (b) the second penalty phase.

3.      The jury charge prevented consideration of specific mitigating evidence at (a) the guilt/innocence and (b) second penalty phase.

4.      The doctor who examined Hatten before (a) his guilt/innocence phase and (b) his second penalty phase failed to advise him that the psychological examination would require Hatten to incriminate himself and did not properly evaluate Hatten's mental state.

5.      The trial court impermissibly had Hatten shackled during (a) his guilt/innocence and (b) second penalty phase.

6.      A biased juror sat on Hatten's guilt/innocence jury.

7.      Hatten was forcibly administered anitpsychotic medication during (a) the guilt/innocence and (b) second penalty phase.

8.      Defense counsel in the second penalty phase failed to hire a competent psychiatrist.

9.      Hatten is presently incompetent to be executed.

10.     Texas failed to appoint competent counsel on state habeas review.

11.     Defense counsel failed to object to improper prosecutorial argument in the second penalty phase.

The following table shows when Hatten first presented the claims contained in his federal habeas petition. As reflected in the table, none of these claims were raised in Hatten's 2000 writ. If a claim has not been exhausted, it is not reviewable. *Coleman v. Thompson*, 111 S.Ct. 2546, 2555, 2557 n.1 (1991).

| Federal Habeas Claims | Claim History | | | | |
|---|---|---|---|---|---|
| | Direct Appeal (1997) | Initial State Application (1997) | Second State Application (2000) | Federal Habeas Petition (2003) | Reviewable |
| **CLAIM 1:** Hatten's challenge to Texas's capital murder statute and transferred intent doctrine. | ✔ | ✔ | | ✔ | Yes |
| **CLAIM 2(a)**: Defense counsel provided ineffective assistance in the *guilt/innocence* phase. | | ✔ | | ✔ | Yes |
| **CLAIM 2(b)**: Defense counsel provided ineffective assistance in the *second punishment* phase. | | | | ✔ | No |
| **CLAIM 3(a).** The jury charge at the *guilt/innocence* trial effectively prevented consideration of specific mitigating evidence | | ✔ | | ✔ | Yes |
| **CLAIM 3(b)** The jury charge at the *second punishment* trial effectively prevented consideration of specific mitigating evidence | | | | ✔ | No |
| **CLAIM 4(a)** The doctor incompetently examined Hatten before the *guilt/innocence* phase. | | ✔ | | ✔ | Yes |
| **CLAIM 4(b)** The doctor incompetently examined Hatten before his *second penalty* phase | | | | ✔ | No |
| **CLAIM 5(a):** The trial court improperly had Hatten shackled during his *guilt/innocence* trial. | | ✔ | | ✔ | Yes |
| **CLAIM 5(b).** The trial court improperly had Hatten shackled during his *second punishment* trial. | | | | ✔ | No |
| **CLAIM 6:** A biased juror sat on the jury that considered Hatten's guilt. | | ✔ | | ✔ | Yes |
| **CLAIM 7(a):** Hatten was forcibly administered antipsychotic medication during the *guilt/innocence* hearing. | | | | ✔ | No |
| **CLAIM 7(b):** Hatten was forcibly administered antipsychotic medication during the *second punishment* hearing. | | | | ✔ | No |
| **CLAIM 8.** Defense counsel in the *second punishment phase* failed to hire a competent psychiatrist. | | | | ✔ | No |
| **CLAIM 9:** Hatten is presently incompetent to be executed. | | | | ✔ | No |
| **CLAIM 10:** Texas failed to appoint competent counsel on state habeas review | | | | ✔ | No |
| **CLAIM 11:** Defense counsel failed to object to improper prosecutorial argument in the *second punishment phase* | | | | ✔ | No |

6

Respondent concedes that Hatten exhausted his first claim. Respondent challenges the procedural posture of all other claims in Hatten's federal habeas petition. Respondent argues that Hatten failed to exhaust the issues he raised in his 1997 writ and the issues he raises for the first time on federal review. Respondent also argues that even if Hatten has exhausted claims in his 1997 writ, he has not exhausted those portions of the claims that attack his second punishment trial.

Before addressing the merits of Hatten's claims, this Court must first determine which of his claims have been presented in a procedurally adequate manner. Under 28 U.S.C. § 2254(b)(1), a federal court generally cannot grant a writ of habeas corpus "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]" The exhaustion doctrine gives state courts the initial opportunity to consider habeas claims. See *Rhines v. Weber*, 125 S. Ct. 1528, 1533 (2005); *Rose v. Lundy*, 102 S. Ct. 1198, 1203 (1982).

Hatten has not exhausted claims 2(b), 3(b), 4(b), 5(b), 7(a), 7(b), 8, 9, 10, and 11,[1] which either address Hatten's second punishment or have only been presented to this Court for the first time on federal habeas review. These claims were never presented to the Court of Criminal Appeals, and Hatten has provided no justifiable basis for this Court to reach the merits of these claims. Hatten has not shown that he can overcome the procedural bar that results from his failure to exhaust his new claims. See *Coleman v. Thompson*, 111 S. Ct. 2546, 2555, 2557 n.1 (1991) (finding that, absent a sufficient showing of cause and prejudice, an unexhausted claim is procedurally barred if the state courts would no longer consider its merits). Therefore, the Court denies those claims 2(b),

---

[1]        Hatten has not exhausted his claim that he is presently incompetent to be executed. That claim will be unripe until his execution becomes imminent. See *Panetti v. Quarterman*, 127 S. Ct. 2842, 2854 (2007). This Court dismisses Hatten's incompetency-to-be-executed claim without prejudice so that he may raise it again when the issue becomes ripe for adjudication. See *id.*

3(b), 4(b), 5(b), 7 (a), 7(b), 8, 9, 10, and 11 without consideration.

Hatten must show to the federal courts that he provided the state courts a full and adequate opportunity to rule on the claims first raised in the 1997 writ (claims 2(a), 3(a), 4(a), 5(a), and 6). This requires an explanation of Texas's capital habeas procedure. The Texas State Constitution guarantees a habeas remedy and explicitly states that "[t]he Legislature shall enact laws to render the remedy speedy and effectual." TEX. CONST., art. I, § 12; see also *Ex parte Davis*, 947 S.W.2d 216, 219 (Tex. Crim. App. 1996). Since 1995, Texas has required a capital inmate's direct appeal and habeas proceedings to run concurrently "to speed up the habeas corpus procedures for capital cases" and "provide an effective habeas remedy." *Ex parte Smith*, 977 S.W.2d 610, 614 (Tex. Crim. App. 1998); *Ex parte Brooks*, 219 S.W.3d 396, 399 (Tex. Crim. App. 2007).

Unanswered questions about the mechanics of Texas's concurrent review system have created procedural difficulties in this case. Under the habeas procedure in place in 1997, when Hatten filed his initial state habeas application, once a trial court enters a death sentence, a capital inmate is required to file an application for a writ of habeas corpus in the trial court, "returnable to the court of criminal appeals," not later than: (1) the 180th day after the appointment of counsel or (2) the 45th day after the date the [State's] original brief is filed on direct appeal. See TEX. CODE. CRIM. PROC. ANN. art. 11.071 § 4(a) (Vernon 1997). The following procedure commences without any further affirmative action by the applicant:

- The district court clerk assigns the application a case number and sends the State a copy of the application. See *id.* at § 6(c)(2), (3).

- The State shall file an answer to the application within 30 days. See *id.* at § 7(a).

- Within 20 days after the State files its answer, the district court must decide if any claims need factual development. See *id.* at § 8.

8

- If the trial court decides that no factual issues need resolution, the trial court must issue an order to that effect within 20 days of the filing of the State's answer. See *id.* at § 8(a). The trial court must then give the parties 30 days to file proposed findings of fact and conclusions of law. The trial court may hold oral arguments, but must make findings of fact and conclusions of law not later than 45 days after determining that no factual issues remain unresolved. See *id.* § 8(c).

- If the trial court determines that factual issues need resolution, the trial court must hold an evidentiary hearing and expeditiously issue findings and conclusions. See *id.* at § 8(d),(e).

The trial court only makes recommendations, it does not grant or deny habeas relief. See *Ex parte Brown*, 205 S.W.3d 538, 546 (Tex. Crim. App. 2006) ("The habeas judge then sets out findings of fact and conclusions of law, and he makes a recommendation to this Court."). A capital inmate does not appeal the lower court's determination. Rather, the clerk of the court automatically and "immediately" transmits the record, pleadings, and lower court recommendation to the Court of Criminal Appeals. *Id.* at §§ 8(d), 9(f). The Court of Criminal Appeals "expeditiously" reviews the habeas application and announces its decision by an appropriate judgment. *Id.* at § 11.

The procedure imposed on the Texas courts by the Texas Legislatures means that the Court of Criminal Appeals must rely heavily upon the trial court to be "Johnny-on-the-Spot." *Ex parte Simpson*, 136 S.W.3d 660, 668 (Tex. Crim. App. 2004); see also *Ex parte Wheeler*, 203 S.W.3d 317, 326 (Tex. Crim. App. 2006); *Ex parte Rodriguez*, 164 S.W.3d 400, 405 (Tex. Crim. App. 2005) (Cochran, J., concurring); *Ex parte Thompson*, 153 S.W.3d 416, 425 (Tex. Crim. App. 2005). The Court of Criminal Appeals generally relies on the trial court to find the facts. See *Simpson*, 136 S.W.3d at 669 ("We are not the convicting trial court, and we are not the original factfinders. It is generally fruitless, if not counterproductive, to file original evidentiary materials relating to a habeas claim with this Court rather than the trial court. Although we might have the implicit authority to

9

consider evidentiary materials filed directly with this Court, normally the jurisprudential considerations of efficiency, effectiveness, and comity to the habeas court counsel against such consideration."); *Ex parte Briseno*, 135 S.W.3d 1, 12-13 (Tex. Crim. App. 2004) ("[W]e afford almost total deference to the trial judge's determination of the historical facts supported by the record, especially when those fact findings are based on an evaluation of credibility and demeanor."). The district court considering the state habeas petition

> is the collector of the evidence, the organizer of the materials, the decisionmaker as to what live testimony may be necessary, the factfinder who resolves disputed factual issues, the judge who applies the law to the facts, enters specific findings of fact and conclusions of law, and may make a specific recommendation to grant or deny relief.

*Simpson*, 136 S.W.3d at 668.

As commented by one judge on the Court of Criminal Appeals:

> Art. 11.071 was enacted to streamline habeas review by providing a full, complete and meaningful review of applications filed by inmates sentenced to death. Such a review cannot occur when the habeas judge provides no record, findings or conclusions relating to the issues raised in the writ application. In other words, we are unable to discharge our duties under art. 11.071 when the habeas judge fails to discharge those required of him.

*Ex parte Murphy*, 917 S.W.2d 28, 29 (Tex. Crim. App. 1996) (Baird, J., commenting in dissent).

A review of the record and survey of the law leaves no question that Hatten did all that the law required of him to have the Court of Criminal Appeals consider his 1997 writ. On February 8, 1996, the district court entered a death sentence. On April 22, 1996, on Hatten's request, the Court of Criminal Appeals appointed writ counsel, Edward Joyal. On September 8, 1997, the State filed its direct appeal brief, triggering Hatten's duty to file his initial habeas application. Hatten timely filed his initial habeas application on December 31, 1997.[2] Hatten filed a supplement to the initial

---

[2]     On October 14, 1997, the trial court granted Hatten an extension of time to file his
                                                                                        (continued...)

10

application on February 10, 1998.

At this point the State's attorneys and the Texas courts made procedural errors. The State acknowledged receipt of the initial application but never filed an answer to the habeas corpus petition and did nothing to litigate it. Edward Joyal even wrote a letter to the District Attorney's Office asking why it had not filed a response (D.E. 48 at 3). The record contains no reply. The district court did not comply with Article 11.071 procedure and ignored *Simpson* because it never decided whether factual issues needed resolution, it did not order the parties to file proposed findings and conclusions, it never made legal or factual findings, and it never ordered the clerk of the court to transmit the case to the Court of Criminal Appeals.[3]

On March 12, 1998, the Court of Criminal Appeals reversed Hatten's death sentence on direct appeal without adjudicating or determining what action the state court should take on Hatten's active habeas application (the 1997 writ). In a letter to Mr. Joyal dated May 6, 1998, Hatten asked,

> Under the new appeal law, both Direct Appeal and the State level petition for Writ of Habeas Corpus were filed concurrently. Nobody here seems to know what effect a Direct Appeal reversal (especially a punishment phase reversal) will have on the still pending Writ of Habeas Corpus under this new law. Is the habeas appeal still active, as a matter of law, or is there something in the statute which permits it to become moot or to be suspended, even if there are guilt-innocence issues still active?

(D.E. 48 at 20). This case gave the Texas courts the opportunity provide any reasoned answer it

---

[2]      (...continued)
habeas application. His application was due on December 31, 1997.

[3]      A significant change in Texas procedure became effective September 1, 1997. Hatten's first state habeas application was filed just three months later on December 31, 1997. Before the change, the failure of a convicting court to issue findings of fact and conclusions of law "constitutes a finding that previously unresolved factual issues material legality of the applicants confinement do not exist." This provision was dropped from the statute, effective September 1, 1997. The Court concludes the district judge may have been operating under outdated law.

chose, but no answer has ever been given.

Hatten received a new death sentence on December 9, 1998. Hatten filed a second direct appeal in which he raised issues attacking the guilt/innocence trial. The Court of Criminal Appeals only considered issues relating to Hatten's second punishment phase. *Hatten v. State*, No. 72,302 at 2 (Tex. Crim. App. June 20, 2001) (unpublished). A copy of Hatten's 1997 writ was included as part of the clerk's record on Hatten's second direct appeal, but the Court of Criminal Appeals made no effort to adjudicate its contents (D.E. 19, 1 of 10, Vol. I of II of 347th District Court Clerk's Record on appeal to Court of Criminal Appeals, 107-231).

To file a second habeas petition, Hatten wanted Mr. Joyal to continue as his counsel, but on March 18, 1999, Mr. Joyal moved to withdraw as writ counsel of record. In his letter asking the Court of Criminal Appeals to let him withdraw as counsel, Mr. Joyal noted: "When the [Court of Criminal Appeals] granted Appellant a new trial on the punishment phase of his conviction, the ruling presented the possibility that with a new resentencing favorable to Appellant, the Writ Application would become moot. However, Appellant's second death penalty sentence now requires the continued pursuit of the Writ Application" (D.E. 48 at 7). In an affidavit of Mr. Joyal submitted by Hatten in response to the Respondent's motion for summary judgment, Mr. Joyal attests that "[a]t no point . . . did either Mr. Hatten or myself ever manifest an intent to abandon Mr. Hatten's constitutional claims" (D.E. 48 at 11).

On November 22, 1999, the trial court appointed Grant Jones as new habeas counsel, who filed the second writ on August 7, 2000. The 2000 writ filed by Mr. Jones did not mention the issues raised in Hatten's 1997 writ. The district court adjudicated the 2000 writ. On January 9, 2002, the Court of Criminal Appeals denied Hatten's 2000 writ.

12

On April 18, 2003, Hatten filed his federal habeas petition (D.E. 22). Hatten filed a motion asking this Court to stay his federal proceedings because the state district court still had jurisdiction over his 1997 writ (D.E. 23). Respondent filed an answer and moved for summary judgment (D.E. 31). Even though invited by this Court, Respondent failed to provide any Texas case law regarding the effect of the reversal of punishment on a concurrently filed habeas petition that raises claims involving the merits of guilt/innocence. As a result, this Court stayed the federal proceedings to allow "expeditious . . . resolution of the procedural question of whether his initial state habeas application remain[ed] pending" (D.E. 32 at 3-4). Hatten's attorneys proceeded to litigate the question in the state district court, but Respondent proceeded to the Court of Criminal Appeals. The state district court appointed attorneys to represent Hatten, presumably under the belief that, since the initial state application had never been transferred to the appellate court, the lower court retained jurisdiction.

Respondent filed a "Motion to Dismiss Application as Moot" in the Court of Criminal Appeals. On August 18, 2003, the General Counsel to the Court of Criminal Appeals sent the state district judge assigned to Hatten's state proceedings a letter stating that the appellate court granted the motion to dismiss as moot. Other than this letter, there is no record evidence that the Court of Criminal Appeals granted that motion. The Court in its research could not determine whether the office of General Counsel to the Court of Criminal Appeals has the power to speak for or bind the Court.

On October 2, 2003, this Court held a status conference and observed that there was no written order from the Court of Criminal Appeals indicating that the it had made any ruling on the 1997 writ (D.E. 33). In response, Respondent asked the Court of Criminal Appeals to enter a

13

written order memorializing its decision.  On October 20, 2003, the Court of Criminal Appeals summarily denied Respondent's motion to enter a written order.

This Court reopened the federal proceedings (D.E. 42) and denied Respondent's summary judgment motion predicated largely on the exhaustion of state remedies:

> Respondent speculates that Hatten should have done more to place his guilt/innocence claims before the Texas courts and that, by failing to do so, he waived his claims. Hatten asserted his challenges to the guilt/innocence phase in his initial application. The Texas judiciary never acted on that pleading. Texas law does not clearly indicate what a petitioner should do to have the Texas courts adjudicate his guilt/innocence claims when the Texas courts order a new punishment hearing. No statute, rule of criminal procedure, or case has been offered to the point.

> The message sent by the Court of Criminal Appeals's attorney–that the initial habeas application is moot–does not inform this Court as to what circumstances, rule, or procedure mooted Hatten's initial habeas application. Further, without order from the Court of Criminal Appeals, this Court is reluctant to find that a ruling has been made and what that ruling is.  Without some expression of law, the Court cannot accept as "moot" the unaddressed constitutional claims by a petitioner still subject to a penalty of death (D.E. 57 at 5-6).

Hatten's 1997 habeas application can hardly be moot.  Hatten is still alive but is sentenced to die based on a trial with potential serious constitutional issues.  Both the State's attorneys and the state district court erred by not following Texas law.  The State failed to answer, and the district court failed to commence a review to determine what, if any, findings should be made.  Respondent has not pointed to any statute, rule, or judicial precedent which shows that the prosecution should not have answered and the district court should not have adjudicated the claims attacking Hatten's guilt.  For that reason, this Court gave the Court of Criminal Appeals an opportunity to clarify Texas law.  The Court of Criminal Appeals declined.

The policy of the federal courts has long been to require the exhaustion of state court remedies.  See *Ex parte Royall*, 6 S. Ct. 734 (1886).  Federal courts have also long recognized that

14

the exhaustion requirement is not applied mechanically when the state's procedures for exhaustion are so cumbersome, complex, and confusing that they frustrate good faith attempts to comply with them. *Carter v. Estelle*, 677 F.2d 427, 446-47 (5th Cir. 1982). "Exhaustion ought not be required when the 'state procedural snarls or obstacles preclude an effective state remedy.'" *Galtieri v. Wainwright*, 582 F.2d 348, 354 (5th Cir. 1978) (quoting *Bartone v. United States*, 84 S. Ct. 21, 23 (1963)). Federal courts should not have to follow law that is unannounced and clouded. Texas's refusal to confirm the status of Hatten's initial state habeas application vitiates Texas's ability to rely on exhaustion as a barrier to federal consideration.

Therefore, this Court decided to address the merits of claims 2(a), 3(a), 4(a), 5(a), and 6, which are found in Hatten's 1997 state habeas application.

## ANALYSIS

The Court has reviewed the following claims. The Court now holds that Hatten is not entitled to habeas relief on these claims because he has not shown that the State of Texas violated his constitutional rights.

- Reginald Hollins's presence on the jury violated Hatten's Fifth Amendment right to due process and Sixth Amendment right to a fair and impartial jury.

- The application of Texas's transferred intent doctrine violated Hatten's Eighth Amendment rights by creating a substantial risk that the death penalty would be inflicted arbitrarily and capriciously.

- Hatten's counsel at the guilt/innocence trial was ineffective and violated his Fifth and Sixth Amendment rights.

- The jury charge at the guilt/innocense phase violated Hatten's Eighth Amendment rights by not allowing the jury to consider the mitigating fact that he did not intend to kill Isaac Jackson.

- Presentation of Dr. Capitaine's expert psychiatric testimony violated Hatten's Fifth and Fourteenth Amendment rights.

15

•       The state district court violated Hatten's right to due process by forcing him to appear before
        the guilt/innocence jury in shackles.

## I.      RIGHT TO AN IMPARTIAL JURY

Reginald Hollins was a juror in the first trial that found Hatten guilty. Hatten claims his

presence on the jury violated his right to a fair and impartial jury. *Irvin v. Dowd*, 81 S.Ct. 1639

(1961) ("The right to jury guarantees to the criminally accused a fair trial by a panel of impartial,

indifferent jurors"). During the process of jury selection, Hollins answered a jury questionnaire,

stating he did not have a "problem" with drugs. As part of general and individual voir dire of him,

Hollins stated he did not know any of the witnesses or Hatten. Tr. Vol. 7 at 718-20. After trial

began, Isaac Robinson, the intended victim and father of the actual victim, recognized Hollins in the

jury box. Robinson recognized Hollins to be someone with whom he (Robinson) had engaged in

drug transactions. Robinson also alleged Hollins was an acquaintance of Hatten's stepfather (a.k.a.

"Paper Man").

The State asked the trial court to remove Hollins from the jury. Tr. Vol. 21 at 541. The

district judge held a hearing to resolve the questions of Hollins's ability to serve as an impartial

juror.[4] In response to questioning by the judge, Robinson testified it would be a lie if Hollins said

---

[4]     The record recounted how Juror Hollins's partiality came into question:

Judge Joaquin Villarreal:

Let the record reflect that a matter was brought to the attention of the court that the witness
that testified yesterday Isaac Robinson indicated to someone his attorney or someone that
he knew one of the jurors, specifically Juror Number 5 by the name of Reginald Hollins. It
was brought to the attention of the court that transactions, one or more transaction of
contraband, I think, specifically crack cocaine, occurred between the witness Robinson and
the juror in the past.

(continued...)

he never had a problem with drugs or never had any involvement with drugs. Tr. Vol. 21 at 547.

Robinson testified that, while he did not know Hollins other than from "business transactions,"

Hollins repeatedly bought drugs from him. Tr. Vol. 21 at 543, 546, 550, 558. Robinson also said

that Hollins had once traded clothes for drugs. Tr. Vol. 21 at 544. Robinson testified that he had

also seen Hollins with Hatten's stepfather, who was known as "Paper Man." Tr. Vol. 21 at 544. He

was sure that Hollins knew that Hatten was Paper Man's stepson. Tr. Vol. 21 at 555.

　　　　Once Robinson identified concerns about Hollins's drug "problem" and relationship with

the parties, the judge appointed an attorney to represent Juror Hollins. Tr. Vol. 21 at 552. The judge

expressed concern that the questioning could lead to criminal charges against Hollins:

> [M]y interest in this inquiry is that we have a fair trial, both for the State and the
> defendant. If we don't continue with any juror that might be prejudiced either
> against the State or the defendant for any reason is the State in this for the same
> reason or do you plan to follow up with criminal charges [against] this witness – or
> this juror?

Tr. Vol. 21 1at 559. The prosecution agreed to extend Hollins immunity for any drug transaction,

---

[4]　　　(...continued)
Further, that the court was advised that Mr. Robinson had indicated that he knew the
juror, that the juror knew the defendant and that the juror knew the defendant's
stepfather, that there were many occasions that he saw the defendant or his stepfather
in company of the juror.

The court has been requested to remove the juror for cause because during the – the
questionnaire that the juror was given prior to the individual voir dire he indicated
that he did not know Larry Hatten, the defendant, or any of his family.

I don't know if he was questioned about any – well, anyway, if nothing else, that the
State has reason to believe that this juror is prejudiced, that he did not answer all the
questions truthfully, that if he had answered these questions truthfully that the State
would have had cause to strike the juror either for cause or to exercise his
peremptory challenge that these matters were not brought to the attention of the State
until yesterday, two or three days after we started testimony in this case.

Tr. Vol. 21 at 541.

as well as for "any possible false answers on the questionnaire[.]" Tr. Vol. 21 at 562.[5] The judge

again emphasized "I am interested in clearing up the record, the State is interested in not coming

back on this issue, not being reversed on this issue." Tr. Vol. 21 at 564.

Hollins was brought into the courtroom outside the presence of the jurors. The judge

informed Hollins that the point of the hearing was to "get to the truth" and that "[n]obody is

interested in prosecuting [him] or anybody else for anything." Tr. Vol. 21 at 565.[6] Hollins affirmed

that he was truthful when he said on his jury questionnaire that he did not know the trial participants.

Tr. Vol. 21 at 568. Hollins explained that he and Paper Man "go back a long ways," but that he did

not know his real name or relationship with Hatten. Tr. Vol. 21 at 571. Hollins limited his

connection with Hatten's stepfather: "We are acquaintances, we are not friends. But we are

acquaintances because we have hung out together or, did things together, but we are not friends."

---

[5]       Notwithstanding the promise of immunity the trial court informed Hollins's attorney:
"Tell him there is no guarantee if he takes the Fifth or if he doesn't testify at all, there is no
guarantee that nothing will happen. It only extends, if I understand, if he testifies to the truth. . . .
[I]t is an incentive for him to testify and tell the truth." Tr. Vol. 21 at 563. If Hollins invoked his
right not to testify or simply asked to be removed from jury service, he subjected himself to
prosecution. Tr. Vol. 21 at 563-64. The trial court told the prosecution that "*[i]f he gets up here
and lies, he's yours*." Tr. Vol. 21 at 561 (emphasis added).

[6]       The trial court, however, warned Hollins that

The State has gone as far as indicating to me that if there is anything that has been
testified to that you will be asked about – that anything that happened until this
minute right now that you have immunity, that they will not seek prosecution against
you, in other words. What they are interested in from here on, because if you don't
tell the truth you could be filed on for perjury and that's a third degree felony, range
of punishment from two years to then years in the penitentiary. Again, we are
interested only in the truth and nothing else. We don't care, as far as filing any
charges at all up to this point, you understand? I just want to make sure that I come
out with a fair trial.

Tr. Vol. 21 at 565-66.

Tr. Vol. 21 at 577. Hollins testified that he knew other members of Paper Man's family "by face," but he did not know Hatten. Tr. Vol. 21 at 572, 574.

Hollins testified that he recognized Robinson "by face," but he did not know his name. Tr. Vol. 21 at 569, 578-79. Hollins testified that he had not bought drugs directly from Robinson, but that he swapped clothes for drugs with someone else while Robinson was present. Tr. Vol. 21 at 573. The parties did not discuss Hollins's other drug transactions or drug use, except when Hollins explained that he was truthful when he said he did not have a "problem" with drugs. Tr. Vol. 21 at 574. When asked if he could be impartial, Hollins answered:

> It doesn't change anything. I mean, when I filled [the jury questionnaire] out and I signed it, it was honestly did [*sic*]. I mean, I do know a lot of people in that area because of the way everything has happened there, I knew a lot of them when I was growing up. I don't know names, but I know faces, and when you said Isaac [Robinson], I didn't know who he was then. But when he walked in I knew who he was, but it didn't change anything. . . . Because these people, I see them every now and then, it's not an everyday occurrence or all the time. I see then every now and then if I step out.

Tr. Vol. 21 at 576, 577-78. *Defense counsel did not question Hollins.* When Hollins left the courtroom, the trial court, without explanation of what problems there would be, declared: "Let me tell you, we got problems if I get this guy off. He stays." Tr. Vol. 21 at 582. *The defense never objected to Hollins being a juror. The defense did not move to strike Hollins from the jury. The defense did not ask for a mistrial.* Hollins stayed on the jury that convicted Hatten. There were two alternate jurors available for excused jurors.

In support of his federal habeas application, Hatten submitted an affidavit from Hollins that described his state of mind during the trial court's inquiry into his possible bias:

> During the trial I got freaked out because the bailiff pulled me over to the Judge's Office. At the Judge's Office I got real scared because the Prosecutor came out real strong and threatened to prosecute me for lying and dealing drugs. I was scared of

19

being prosecuted and that the law would be looking for me. I was afraid the State would have something on me or knew something about my dealing drugs. The first thing that came to my mind was that they know something and maybe I sold to an undercover cop. This is why I lied to the Judge and Prosecutor. All this went through my mind not only when I was in the Judge's Office, but while I was deliberating....At that time in my life I had a drug problem and I remember going home at the end of the day after that meeting and doing crack. I was paranoid because of my drug use and I also believe this affected my judgment. I don't believe I was fair to Larry Hatten because I was more concerned about my situation and whether the D.A. was going to investigate me and prosecute me. I basically felt that I had to go along with the State's case or risk being further investigated or prosecuted.

[Affidavit of Reginald Hollins dated 15 June 2005]. The record does not contain any statement from

Hatten's attorneys or the state prosecutor that develops this situation.

This Court held an evidentiary hearing to develop testimony relating to Hollins's affidavit. Hollins did not testify because he did not appear at the hearing. Despite the issuance of a subpoena, neither party could locate Hollins. Hatten did not call any other witness, such as his trial attorneys, to provide context to the jury impartiality issue. Respondent has not presented any evidence or testimony refuting Hollins's affidavit.

The Sixth Amendment guarantees trial by an impartial jury. U.S. CONST. amend. VI. A juror is biased if his "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Soria v. Johnson*, 207 F.3d 232, 242 (5th Cir. 2000). Federal courts have examined allegations of juror bias in two contexts. First, relying on the Supreme Court's decision in *McDonough Power Equipment, Inc. v. Greenwood*, 104 S.Ct. 845, 850 (1984), federal courts recognize express bias when a party shows: (1) that the juror failed to answer a material question honestly on voir dire, and (2) that a correct response would have provided a valid basis for a challenge for cause. *United States v. Collins*, 972 F.2d 1385, 1403 (5th Cir. 1992); see also *Montoya v. Scott*, 65 F.3d 405,  419-20 (5th Cir. 1995).

The question posed on the jury questionnaire was "Have you, your spouse, other family members, or close friends ever had a problem with drugs?" Tr. Vol. 21 at 567. This is virtually a non-question because its meaning is obscure. Is the question intended to identify jurors who use drugs, object to their use, or who do not object to their use? Because of ambiguity in the wording about a drug "problem," the record does not prove that Hollins lied in answering that question. Importantly, Hatten has not shown that, even if the parties knew of Hollins's drug transactions and relationship with potential trial witnesses, he was subject to a challenge for cause under Texas state law.[7] Hatten cannot satisfy the *McDonough* test.

A second line of cases recognizes a conclusive presumption of implied bias in appropriate circumstances. *Smith v. Phillips*, 102 S. Ct. 940, 949 (1982) (O'Connor, J., concurring); see also *United States v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001). Federal courts do not look favorably upon attempts to impute bias to jurors and only in extreme situations do they justify such a finding. *Solis v. Cockrell*, 342 F.3d 392, 396 (5th Cir. 2003) (quotations omitted). In *Phillips*, Justice O'Connor listed some circumstances that may justify a finding of implied bias:

> Some examples might include revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the

---

[7]    Texas statutory law governs challenges for cause. TEX. CODE CRIM. PRO. art. 35.16 allows a challenge for cause to be made when "the juror has been convicted of misdemeanor theft or a felony" or "the juror is under indictment or other legal accusation for misdemeanor theft or a felony," but makes no provision for unadjudicated drug use or dealing. Under Texas law, "the mere fact that a juror knows the victim is not sufficient basis for disqualification." *Montoya*, 65 F.3d at 420. Texas "law requires more than the existence of a casual acquaintance with the victim of a crime or the victim's family to make a prospective juror subject to a challenge for cause." *Little v. State*, 758 S.W.2d 551, 559 (Tex. Crim. App. 1988); see also *Williams v. State*, 682 S.W.2d 538, 542-43 (Tex. Crim. App. 1984); *Anderson v. State*, 633 S.W.2d 851, 854 (Tex. Crim. App. 1982). A mere "tenuous relationship" or "friendship . . . standing alone" does not "justify a finding of bias." *Solis v. Cockrell*, 342 F.3d 392, 396 (5th Cir. 2003) (citing *Andrews v. Collins*, 854 F.2d 697, 699-700 (5th Cir. 1988)). Hatten has not definitively shown that, had Hollins answered truthfully the questions put to him, he would have been excused from jury service.

trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction. Whether or not the state proceedings result in a finding of "no bias," the Sixth Amendment right to an impartial jury should not allow a verdict to stand under such circumstances.

102 S. Ct. at 949 (O'Connor, J., concurring).[8]

There are two reasons why Hatten challenges Hollins's jury service. First, Hatten accuses Hollins of lying during voir dire on his jury questionnaire and during his questioning. Second, Hatten alleges that Hollins's fear of prosecution made him an agent for the State and biased against the defense. Neither reason requires this Court to presume that Hollins was a biased juror.

Hatten alleges that Hollins "perjured himself on his juror questionnaire, misinformed the court concerning his knowledge and relationship with Paper Man, failed to acknowledge his repeated felony drug dealings with the victim's father, Mr. Robinson, and personal drug use, thereby perjuring himself a second time in the proceeding, and failed to disclose that he knew" various trial participants (D.E. 22 at 71-72).

Hatten overstates the extent to which Hollins was possibly untruthful. Hatten's habeas petition claims that Hollins knew the defendant personally and promised to verify that assertion through an affidavit from Paper Man (D.E. 22 at 68). Nothing has been filed that substantiates the claim that Hollins knew Hatten personally. Hollins explained that he did not disclose his relationship with the various trial participants because he only knew them by street names or by face.

---

[8]     Other courts have found implied bias when a juror: faced criminal charges from an incident occurring during trial, *Brooks v. Dretke*, 418 F.3d 430, 433-34 (5th Cir. 2005); hid a prior conviction in order to serve on the jury, *Green v. White*, 232 F.3d 671 (9th Cir. 2000); refused to divulge that a brother had been murdered, *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998); only returned a conviction in a burglary case after the juror's rooms had been burglarized during at the hotel where they were sequestered, *Hunley v. Godinez*, 975 F.2d 316 (7th Cir. 1992); had been abused in a manner similar to the victim, *Burton v. Johnson*, 948 F.2d 1150, 1158 (10th Cir. 1991); and failed to disclose that a brother worked in the sheriff's office that had performed some of the investigation in the case, *United States v. Scott*, 854 F.2d 697 (5th Cir. 1988).

Even if Hollins lied, Hatten has not provided any evidence or testimony showing that Hollins's relationship with trial participants was more than a "tenuous relationship" that did not impact his consideration of the evidence. *Andrews v. Collins*, 21 F.3d 612, 621 (5th Cir. 1994) (denying habeas relief when a juror did not disclose his relationship to the victim); see also *United States v. Wilson*, 116 F.3d 1066, 1087 (5th Cir. 1997) (finding that friendship with those associated with the trial "does not, standing alone, justify a finding of bias"); cf. *Phillips*, 102 S. Ct. at 948 (O'Connor, J., concurring) (suggesting that relief is appropriate when "the juror is a *close relative* of one of the participants in the trial or the criminal transaction"). Nothing before the Court verifies that Hollins lied about the nature or extent of his relationship with those associated with the trial.

The accusation that Hollins lied about his drug "problem" is more difficult. Hollins's federal habeas affidavit attests that he had a greater involvement in drug dealing and use than he admitted at trial. The evidence, however, does not conclusively show that Hollins perjured himself with respect to the questions put to him. While the record certainly conflicts as to the number and nature of the drug transactions between Hollins and Robinson, Hollins never denied *some* participation in drug deals. Although Robinson painted Hollins as more involved in drugs than he would admit, Hatten now assumes that Robinson told the truth. Nothing in the record allows this Court to determine which of the two drugsters, Robinson or Hollins, was more credible. Hatten has presented no evidence to confirm the statements in Hollins's affidavit. Nothing in the record provides a basis for this Court to credit his affidavit with any dispassionate credibility.

Hatten contends that Hollins's fear of prosecution encouraged him to favor the State. Hatten compares this case and *Brooks v. Dretke*, 418 F.3d 430 (5th Cir. 2005). In *Brooks*, a juror was arrested during a capital murder trial. On the first day of the punishment phase, the defense moved

for a mistrial because that morning the juror had been arrested for entering the courthouse with a handgun. The defense moved to strike the juror but was unsuccessful. The trial court questioned the juror, who stated that his arrest would not impede his ability to consider the evidence fairly. At a subsequent habeas evidentiary hearing, the juror testified that his arrest in no way impacted his deliberations.

The Fifth Circuit found that Brooks deserved a new trial. Though the state courts found credible the juror's assertion that he could remain impartial, the Fifth Circuit held it "cannot know whether [the juror's] assurances of fairness were realized even if [it] accept[ed] . . . the trial court's finding of his credibility." *Id.* at 433. The Fifth Circuit found that the juror's influence fell into a category of "implied bias":

> Our question is whether [the juror's] conduct is of the genre of cases Justice O'Connor pointed to in her concurring opinion in *Phillips:* juror conduct not salvageable by post event hearings. We think that the answer to this question is yes. [The juror] was married with two young children. As he listened to the evidence in the sentencing phase and participated in the jury's decision of the State's contention that Brooks should be put to death he was facing a stunning turn of events in his own life. He could have been sentenced to a year in jail; worse yet, he could have faced a felony prosecution, notwithstanding the State's interpretation in this case of the older version of the Texas gun possession statute. True enough he was not an employee of the district attorney's office, but in practical ways his future was even more in its hands. [The juror] testified that the sentencing hearing "was one entire week of hell" and he suffered "unrelenting embarrassment." He thought the matter of his arrest was to be held in confidence, but his "name and this case [was] the head story at twelve, five, six and ten o'clock for four straight days."
>
> We do not suggest that being charged with unlawfully carrying a weapon alone disqualified [the juror] for jury service under state law or that any outstanding misdemeanor charge should support a finding of implied bias. It is rather the sum of all factual circumstances surrounding this juror − in particular, the power of the District Attorney, and the timing and sequence of events − that compels this conclusion. As Lord Coke put it, a juror must be as "indifferent as he stands unsworne." That there is no evidence that the District Attorney did anything to exploit his power over juror [the juror] is of no moment. That the power presents an intolerable risk of working its will without the raising of a hand or a nod is the vice

24

here.

*Id.* at 434-35.

Both parties recognize, and the Court agrees that *Brooks* is similar to this case. In both cases, a juror who told the trial court he would be impartial became entangled in the possibility of criminal prosecution. In both cases, the State did not try to manipulate the circumstances to win a favorable verdict, but under the circumstances, a juror could have a bias to please the prosecutor's office in the protection of her own self interest.

Hatten's case is distinguishable from *Brooks*. In *Brooks* the defense actively challenged the juror's partiality, asking for recusal and a mistrial. Here, the defense sat silent when Hollins's impartiality became an issue. Defense counsel made no objection, raised no complaint, and did not challenge Hollins's jury service. Defense counsel did not even question Hollins. ***The defense acquiesced in Hollins's jury service and failed to make the inquiries that would have exposed any bias Hollins had toward the prosecution.*** See *Conner v. Polk*, 407 F.3d 198, 207 (4th Cir. 2005) (finding no implied bias and distinguishing those cases where "the jurors were allowed to serve over the objection of defense counsel, or counsel lacked knowledge of the facts giving rise to the juror's potential bias").[9]

The bias inherent in *Brooks* was objectively understandable and easily apparent to the trial

---

[9]     Hatten makes the cursory argument in the alternative that defense counsel provided ineffective assistance by not requesting Hollins's dismissal, asking for a mistrial, or challenging the issue on direct appeal (D.E. 22 at 75). Hatten's superficial mention of that claim fails to carry his substantial burden of demonstrating entitlement to habeas relief, particularly as he has made no effort to secure counsel's perspective on the jury impartiality issue. Importantly, Hatten does not show that counsel did not make a strategic decision to let Hollins remain on the jury. Even so, the record does not suggest that the trial circumstances, as they appear in the record, would have provided a successful area of objection.

court. The *Brooks* juror had actual criminal charges pending during the trial. The Fifth Circuit emphasized in denying rehearing *en banc* that *Brooks* did not require "a finding of implied bias any time the district attorney has the power to prosecute a sitting juror[.]" *Brooks v. Dretke*, 444 F.3d 328, 332 (5th Cir. 2006) (opinion on denial of rehearing en banc).

Here, Hollins did not face an impending or unavoidable prosecution. The State never lodged charges against Hollins and, in fact, promised him immunity from prosecution, and there was a dearth of evidence. Therefore, the possibility that Hollins would be prosecuted for any crime was far from certain. There is no evidence that Hollins's alleged fear of prosecution was rational under the circumstances. Here, the trial judge who observed Hatten's demeanor was satisfied that he could be impartial. Hatten has not proven that the objective circumstances were so extreme that this Court must presume that Hollins was biased.

Courts have a weighty obligation to safeguard the right to a trial by impartial jurors. When suggestions of bias come before a court, the tribunal must scrupulously investigate the allegations to protect the accused's rights. See *Virgil v. Dretke*, 446 F.3d 598, 605 (5th Cir. 2006). The trial court could have easily solved this problem at trial. Two alternate jurors heard the trial testimony in this case but did not participate in deliberations. The trial court could have dismissed Hollins and let an alternate juror deliberate the question of guilt. From all appearances, the obviously better course in this case would have been to dismiss Hollins. However, "[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." See *Delaware v. Van Arsdall*, 106 S. Ct. 1431, 1436 (1986). Given Hatten's complete failure to object at trial and his current failure to show that Hollins lied, Hatten has not shown that Hollins's jury service abrogated his right to a fair and impartial jury.

26

## II.   TEXAS'S TRANSFERRED INTENT DOCTRINE

Hatten argues that the combination of Texas's killing-of-a-child capital murder precursor (TEX. PENAL CODE § 19.03(a)(8)) and its transferred intent doctrine (TEX. PENAL CODE § 6.04(b)) lessened the prosecution's burden of proving that he committed a capital offense.  The basis for his argument is that he "accidentally" shot the child victim.  Hatten raises several constitutional objections, the bulk of which apply to sentencing issues.

The Fifth Circuit has upheld Texas's child capital murder statute, and the use of transferred intent doctrine in prosecutions under that statute. See *Baltazar v. Cockrell*, 34 Fed. App'x 151, 2002 WL 495560 *5 (5th Cir. Mar. 18, 2002); *Styron v. Johnson*, 262 F.3d 438, 451-52 (5th Cir. 2001). The jury instructions in this case required the jury to find, beyond a reasonable doubt, that Hatten possessed the proper intent to commit capital murder, and that his actions resulted in a death-eligible offense. Texas law has long held that "[a] defendant may not rely on the doing of an unintentional act as a defense when he, in fact, intended to commit another crime." *Sargent v. State*, 518 S.W.2d 807, 809 (Tex. Crim. App. 1975).  Hatten's argument that the jury could not properly consider that he "accidentally" killed only restates the reasoning behind the transferred intent doctrine: he meant to kill one person but did not directly anticipate the death of the actual victim.  Despite his reliance on several constitutional theories, Hatten has not shown any federal constitutional error in the application of Texas's transferred intent doctrine to the facts of this case.

## III.   INEFFECTIVE ASSISTANCE OF COUNSEL

Hatten challenges the efforts of his attorneys at his guilt/innocence trial:

- defense counsel failed to establish a minimum level of contact and communication;

- defense counsel failed to visit the crime scene, show that Isaac Robinson received a benefit for his testimony, prove that Hatten did not know he was shooting a child,

make satisfactory objections, and engage in adequate cross examination;

- defense counsel made inadequate opening and closing arguments; and

- defense counsel failed to advise Hatten of his *Miranda* rights associated with pre-trial mental examinations.

Under the standard established in *Strickland v. Washington*, 104 S. Ct. 2052, 2064 (1984), a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." *Yarborough v. Gentry*, 124 S. Ct. 1, 4 (2003); see also *Wiggins v. Smith*, 123 S. Ct. 2527, 2535 (2003). Hatten cannot succeed in showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 104 S. Ct. at 2064. Hatten's identity at trial was never in question. Hatten admitted at trial that he went to the Robinson house with the intent to kill Robinson. The evidence overwhelmingly inculpated Hatten for capital murder. The allegations Hatten now raises against his trial attorneys would do little to diminish the damning evidence against him. Hatten's claims of ineffective assistance would not have reasonably changed the jury's consideration of the inundating evidence against him.

## IV.    JURY'S CONSIDERATION OF MITIGATION AT THE GUILT/INNOCENCE PHASE

Hatten argues the jury charge at the guilt/innocence phase impinged the jury's ability to consider the mitigating fact that he did not intend to kill Isaac Jackson. In Texas's bifurcated sentencing scheme, the jury need only have a vehicle to consider mitigating evidence in the punishment phase. See *Jurek v. Texas*, 96 S. Ct. 2950, 2958 (1976) ("By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances

relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function."). As previously noted, the fact that Texas's transferred intent doctrine allowed for a capital prosecution against Hatten in these circumstances poses no constitutional concern. Hatten has not shown constitutional error with respect to the guilt/innocence jury instructions.

## V.      EXPERT ASSISTANCE

One of Hatten's claims involves the trial court's initial appointment of the same person to serve as the defendant's psychiatric expert and the court's disinterested expert on insanity. The expert testimony was used during the first and second punishment phases. It was not used during the guilt/innocence phase of trial. On November 13, 1995, at the defendant's request, the trial court appointed Dr. Raul Capitaine to assist in developing mental health mitigating evidence for the first punishment phase. On December 11, 1995, the defense filed a notice of intent to pursue an insanity defense. The prosecution then sought the appointment of Dr. Capitaine as a disinterested expert on insanity under then-effective TEX. CODE CRIM. PRO. art. 46.03(3). Dr. Capitaine filed a report with the court, stating that Hatten was not insane when he committed the offense and was competent to stand trial. He did not testify during the guilt/innocence phase. Hatten argues that Dr. Capitaine should not have held these dual roles. Hatten contends that Dr. Capitaine amplified inherent problems with this dual appointment by failing to warn him of his right against self-incrimination as required by *Estelle v. Smith*, 101 S. Ct. 1866 (1981).

Hatten has not shown with specificity how the dual appointment of Dr. Capitaine harmed his defense. The court offered to appoint a new expert for the defense. Tr. Vol. 4 at 37. Hatten's attorneys then chose not to present expert testimony in the guilt/innocence trial. While Hatten has

29

generated some new psychological evidence on federal habeas review, he has not shown that the original dual appointment prevented the development of that information or otherwise harmed his defense. Defense counsel had information showing that Hatten was not insane when he committed the murder. Nothing about Dr. Capitaine's dual role would have changed defense counsel's evaluation of the need for expert testimony on guilt. Even assuming that the removal of conflicting appointments would have allowed Dr. Capitaine to uncover the additional psychological evidence Hatten has amassed during these proceedings, particularly attributing the crime to drug use, that information would do little to change the jury's evaluation of his guilt. See *Hernandez v. Johnson*, 213 F.3d 243, 250 (5th Cir. 2000) ("[E]vidence of voluntary intoxication [does not] negate the element of specific intent required for capital murder.").

Hatten cites to *Estelle v. Smith* in support of his claim. "The Supreme Court held in *Estelle v. Smith* that the state's use, *during the penalty phase* of a capital trial, of the testimony of a psychiatrist who performed a court-ordered competency examination on the defendant, violated the defendant's Fifth Amendment right since the defendant was not warned that the statements could be used during the penalty phase." *Coble v. Dretke*, 444 F.3d 345, 354 (5th Cir. 2006) (emphasis added).

Hatten has not established entitlement to relief. He bases his claim on the absence of any statement in Dr. Capitaine's reports showing that he delivered adequate *Miranda* warnings. However, Hatten has never presented any testimony or evidence showing that Dr. Capitaine *did not* give adequate warnings. He only speculates that the warnings never were given based on the reports' silence on the issue. At any rate, the matters before this Court only extend to the guilt/innocence phase of Hatten's trial. Neither party called Dr. Capitaine as a witness in the trial

30

of Hatten's guilt, and the defense made no effort to bring the results of his examination to bear in that proceeding. Any alleged error had no impact on Hatten's guilt trial. See *Satterwhite v. Texas*, 108 S. Ct. 1792, 1798 (1988) (finding that the "harmless error rule applies to the admission of psychiatric testimony in violation of the Sixth Amendment right set out in *Estelle v. Smith*"). Hatten has not shown entitlement to relief with regard to defense counsel's use of expert witnesses.[10]

## VI.   SHACKLING

Hatten argues the trial court violated his constitutional rights by forcing him to appear before the guilt/innocence jury in shackles. Federal law disallows the routine shackling of a criminal defendant. See *Deck v. Missouri*, 125 S. Ct. 2007, 2010 (2005) ("The law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need."). Respondent initially maintained that "*there is no indication that jurors ever saw the shackles,*" (D.E. 31 at 88), but now concedes that Hatten's shackling was plainly evident to the jury that considered his guilt.

Unnecessary shackling is "'inherently prejudicial.'" *Deck*, 125 S. Ct. at 2015 (quoting *Holbrook v. Flynn*, 106 S. Ct. 1340 (1986)). Habeas relief is required unless "'beyond a reasonable doubt . . . the [shackling] error complained of did not contribute to the verdict obtained.'" *Deck*, 125 S. Ct. at 2015-16 (quoting *Chapman v. California*, 87 S. Ct. 824 (1967)). Here, the shackling could have sent the guilt/innocence jury a signal that Hatten was dangerous and likely guilty. However, the evidence against Hatten was overwhelming. This Court is wary of being an apologist for trial errors, but on habeas corpus review this Court has to examine any prejudice to Hatten. The Court

---

[10]   Hatten's petition makes cursory accusations that defense counsel should have handled Dr. Capitaine's appointment differently. Hatten has not briefed or developed that issue sufficiently as an ineffective-assistance-of-counsel claim to merit serious consideration.

31

finds beyond a reasonable doubt that Hatten's being shackled at the guilt/innocence phase did not contribute to the guilty verdict. There was never a question about Hatten's identity as the murderer. The only defense before the jury was Hatten's intent. Hatten himself testified that he intended to kill Robinson. Tr. Vol. 22 at 685. Appearing before the jury while shackled did not impact Hatten's defense and did not violate his constitutional rights.

Hatten has raised issues that have required careful judicial attention. Nevertheless, the Court finds that claims one through six do not require the issuance of a habeas writ.

## CERTIFICATE OF APPEALABILITY

The AEDPA prevents appellate review of a habeas petition unless the district or circuit courts certify specific issues for appeal. See 28 U.S.C. § 2253(c); FED. R. APP. PRO. Rule 22(b). Hatten has not yet requested that this Court grant him a Certificate of Appealability ("COA"), though this Court can consider the issue *sua sponte*. See *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see also *Slack v. McDaniel*, 120 S. Ct. 1595, 1604 (2000). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 123 S. Ct. 1029, 1034 (2003).

Considering the unusual posture of this case and the issues raised, the Court grants a certificate of appealability with respect to all claims adjudicated by the Court.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Petitioner Larry Hatten's Petition for Writ of Habeas Corpus (D.E. 22) **WITH PREJUDICE** with the exception of Hatten's incompetency-to-be-executed claim that this Court **DISMISSES WITHOUT PREJUDICE**.  All outstanding motions are otherwise **DENIED**.  A Certificate of Appealability is **GRANTED** with respect to all claims adjudicated by the Court.

**ORDERED** September 25, 2007.

HAYDEN HEAD
CHIEF JUDGE

33

**Appendix A**

| | | |
|---|---|---|
| 1. | January 29, 1996 | The guilt/innocense phase of trial began. |
| 2. | February 8, 1996 | The jury found Hatten guilty of capital murder and sentenced him to death. |
| 3. | April 22, 1996 | The Court of Criminal Appeals appointed Edward Joyal as Hatten's writ counsel. |
| 4. | March 10, 1997 | Hatten filed a direct appeal. |
| 5. | September 8, 1997 | The State filed its direct appeal brief. |
| 6. | October 14, 1997 | The trial court granted Hatten an extension of time to file his habeas application. |
| 7. | December 31, 1997 | Hatten filed an initial state habeas application. |
| 8. | February 10, 1998 | Hatten filed a supplement to his initial state habeas application. |
| 9. | April 29, 1998 | The Court of Criminal Appeals ordered a new punishment hearing on Hatten's direct appeal. |
| 10. | December 9, 1998 | Second jury sentenced Hatten to death. |
| 11. | March 18, 1999 | Edward Joyal moved to withdraw as writ counsel of record. |
| 12. | October 26, 1999 | Hatten filed a second direct appeal. |
| 13. | November 22, 1999 | The trial court appointed Grant Jones as new writ counsel. |
| 14. | August 7, 2000 | Hatten filed a second state habeas application. |
| 15. | August 28, 2000 | The state district court entered a recommendation on the second habeas application and forwarded the case to the Court of Criminal Appeals. |
| 16. | June 20, 2001 | The Court of Criminal Appeals denied Hatten's second direct appeal. |
| 17. | January 9, 2002 | The Court of Criminal Appeals denied relief on the second habeas application. |

34

| | | |
|---|---|---|
| 18. | August 1, 2003 | This Court stayed federal proceedings to allow for resolution of the procedural question of whether Hatten's state habeas application was still pending in state court. |
| 19. | August 18, 2003 | Respondent filed a motion to dismiss Hatten's original application as moot in the Court of Criminal Appeals. |
| 20. | August 18, 2003 | General Counsel to the Court of Criminal Appeals sent a letter to the state district judge assigned to Hatten's state proceedings stating that the appellate court granted Respondent's motion to dismiss. |
| 21. | October 13, 2003 | Respondent files motion asking the Court of Criminal Appeals to enter a written order memorializing its decision. |
| 22. | October 20, 2003 | Troy C. Bennett, Clerk of the Court of Criminal Appeals, indicates in  a note to the Nueces County District Attorney that the Court denied Respondent's motion to enter a written order. |